**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-4496

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

EL SHAFEE ELSHEIKH,

Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, Senior District Judge. (1:20-cr-00239-TSE-2)

Argued: March 22, 2024                           Decided: June 7, 2024

Before AGEE, QUATTLEBAUM, and HEYTENS, Circuit Judges.

Affirmed by published per curiam opinion.

**ARGUED:** Nicholas Joseph Compton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellant. Aidan Taft Grano-Mickelsen, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Kristen M. Leddy, Assistant Federal Public Defender, Aaron D. Moss, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellant. Alicia Cook, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jessica D. Aber, United States Attorney, Richmond, Virginia, Raj Parekh, Assistant United States Attorney, John T. Gibbs, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

PER CURIAM:

El Shafee Elsheikh appeals his convictions for offenses arising from his role in a terrorist hostage-taking scheme undertaken to support the Islamic State of Iraq and al-Sham (ISIS).[1] Each issue he raises on appeal challenges the admissibility of certain evidence against him at trial. For the reasons set forth below, we affirm Elsheikh's convictions and sentences.

I.

We will discuss the circumstances surrounding the specific categories of evidence Elsheikh challenges in the context of analyzing those issues, but begin with a brief overview of the evidence adduced at trial. In 2012, Elsheikh, who was then a citizen of the United Kingdom, traveled to Syria where he subsequently joined ISIS. Over a three-year period, Elsheikh and others—including co-defendant Alexanda Amon Kotey and Mohammad Emwazi (deceased)—captured and held hostage United States, United Kingdom, and other foreign nationals. Some hostages were released; others were summarily executed and their deaths subsequently featured in ISIS propaganda materials.

The hostages nicknamed their principal captors "the Beatles" because the men spoke English with British accents. Emwazi appeared to be the leader, with Elsheikh and Kotey assisting him. Throughout their scheme, the Beatles took measures to avoid being

---

[1] "In one form or another, ISIS has been designated a Foreign Terrorist Organization since 2004; it has also been known as the Islamic State of Iraq and the Levant, al Qaeda in Iraq, and the al-Zarqawi Network." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 478 n.1 (2023).

identified, such as by wearing balaclavas and gloves and ordering hostages to face or look away from their captors. The Beatles gained international notoriety for their brutal treatment of hostages, which included waterboarding, forced boxing matches between male hostages, and beatings. Their activities garnered significant international attention in 2014 when ISIS published propaganda videos depicting four separate occasions in which Emwazi castigates the United States and its allies before beheading a male hostage. In another video, Emwazi made similar comments while standing over a fifth male hostage who had already been decapitated. Throughout their endeavors, the Beatles used proof-of-life recordings and execution videos to exhort the hostages' family members and governments to meet certain demands such as paying ransom fees or undertaking certain foreign-policy actions.

The Beatles' hostages generally consisted of journalists and aid workers on assignment in the region. They were held at various locations in Syria. Four of the hostages were United States citizens. James Wright Foley, a journalist, was kidnapped in November 2012 and held hostage until his beheading in August 2014. Steven Joel Sotloff, a journalist, was kidnapped in August 2013 and beheaded around September 2014. Peter Edward Kassig, an aid worker, was kidnapped in October 2013 and beheaded in November 2014. Kaylan Jean Mueller, an aid worker, was kidnapped in August 2013 and was killed around February 2015, after the Beatles had transferred her to other ISIS members.

With time, ISIS began losing ground in Syria, and in January 2018, the Syrian Democratic Forces (SDF), a Kurdish militia, captured Elsheikh and Kotey as they were attempting to flee across the Syrian border into Turkey.[2]

The SDF relied on assistance from United States personnel in performing a biometric enrollment process for its detainees. As part of that process, Elsheikh and Kotey were asked several questions, photographed, and fingerprinted. At that time, both Elsheikh and Kotey provided false names and nationalities. But when their fingerprints were entered into a database, Elsheikh and Kotey's true identities became known. When confronted with those biometric matches, both men admitted who they really were.

Elsheikh and Kotey remained in SDF custody for about a year. Early in that detention, United States Department of Defense (DOD) investigators conducted "intelligence gathering" interviews with Elsheikh and Kotey, all without the benefit of *Miranda*[3] warnings. Several weeks after the DOD interviews ended, two individuals identifying themselves as special agents with the United States Federal Bureau of Investigation (FBI) informed Elsheikh and Kotey that they wanted to interrogate them for law-enforcement purposes and that, unlike any statements the men had previously made, these statements could be used against them in a future criminal prosecution. Kotey refused to answer any questions, but Elsheikh selectively answered questions. During their SDF

---

[2] In late 2015, Emwazi was killed in a United States drone strike.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

detention, Elsheikh and Kotey also participated in multiple media interviews, sometimes together and sometimes separately.

In October 2019, Elsheikh and Kotey were transferred to the custody of the United States (the Government), and they were held abroad for approximately one more year. During that time, the Government negotiated with the United Kingdom over the terms of its turning over evidence to assist with prosecuting the men in the United States and, specifically, whether they might face a sentence of death.[4] Those diplomatic negotiations resolved after the Government promised not to seek the death penalty.

In October 2020, a federal grand jury indicted Elsheikh and Kotey on eight counts: conspiracy to commit hostage taking, resulting in death, in violation of 18 U.S.C. § 1203; four counts of hostage taking resulting in death, in violation of 18 U.S.C. §§ 1203 and 2, for the deaths of Foley, Sotloff, Kassig, and Mueller; conspiracy to murder United States citizens outside of the United States (the same four named citizens), in violation of 18 U.S.C. § 2332(b)(2); conspiracy to provide material support or resources to terrorists, namely, to carry out the hostage taking and murders of the four named United States citizens as well as "British and Japanese nationals," in violation of 18 U.S.C. § 2339A; and conspiracy to provide material support or resources to a designated terrorist organization (ISIS), resulting in death, in violation of 18 U.S.C. § 2339B.

Kotey pleaded guilty, but Elsheikh exercised his right to a jury trial. The Government's case against Elsheikh is the sole focus of this appeal. During the two-week

---

[4] Elsheikh and Kotey were both British citizens, but the United Kingdom stripped their citizenship before their prosecution in the United States.

5

trial, the Government presented extensive evidence proving that Elsheikh was one of the Beatles and, more to the point, that he had participated in the charged conspiracies and hostage-taking-and-killing endeavors in support of ISIS. Elsheikh's defense did not contest the underlying criminal conduct of the Beatles, but rather challenged the Government's proof identifying him as a participant in it.

The jury found Elsheikh guilty on all counts, and the district court sentenced him to eight terms of life imprisonment.

Elsheikh noted a timely appeal, and this Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

II.

On appeal, Elsheikh argues the district court committed reversible error in permitting the Government to introduce evidence related to five categories of evidence. First, he contends un-*Mirandized* false identity statements that he made upon his capture in Syria were inadmissible. Second, Elsheikh asserts that even though he had been provided with a *Miranda*-style Advice of Rights form before making certain statements to FBI agents while in SDF custody, those statements were nonetheless inadmissible because they were tainted by earlier, un-*Mirandized* intelligence-gathering interviews conducted by the DOD. Third, he maintains that 2019 media interviews were improperly admitted following the district court's clearly erroneous factual finding that those statements were not the product of abuse and coercion by SDF guards. Fourth, Elsheikh asserts the district court should not have permitted the Government to introduce hearsay statements made by

6

"unavailable" hostages under the forfeiture-by-wrongdoing exception. Lastly, he claims the district court should have limited one witness's testimony to the time in which that witness and Mueller were held captive together.[5]

The Government responds in several ways. On the merits, it asserts that each category of evidence was properly admitted. For some of the challenged evidence, the Government also asserts that Elsheikh has failed to properly preserve the challenge by either failing to object to its admission in the district court or not adequately developing his argument in his opening brief. And for much of the challenged evidence, the Government posits that any error was ultimately harmless and thus would not warrant reversal.

Our standard of review is generally consistent across the various types of challenges that Elsheikh lodges here. "When reviewing the denial of a motion to suppress, [the Court] review[s] the factual findings for clear error and the district court's legal determinations de novo." *United States v. Khweis*, 971 F.3d 453, 459 (4th Cir. 2020) (cleaned up). Similarly, we review a district court's evidentiary rulings for abuse of discretion and a court abuses its discretion when it is either "guided by erroneous legal principles" or it made its decision

---

[5] In his opening brief, Elsheikh also identified as an issue the wrongful admission of documents outlining ISIS's support for enslaving foreign women that had been recovered from a residence where Mueller and a trial witness had been held. But the argument section of his opening brief does not develop any argument regarding the admissibility of this evidence. Accordingly, we conclude that he has not adequately briefed the issue of the admissibility of the ISIS slavery documents and has thus waived appellate review of it. *Compare* Opening Br. 43–44, *with Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (recognizing that an appellant fails to develop an argument consistent with Federal Rule of Appellate Procedure 28(a)(9) when the opening brief merely "takes a passing shot at the issue").

based "upon a clearly erroneous factual finding." *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (cleaned up). And even in the event of error, we will not reverse if that error was harmless, which we determine by applying the standard for either constitutional or non-constitutional error, depending on the nature of the underlying argument to exclude the evidence. *United States v. Ferguson*, 752 F.3d 613, 618 (4th Cir. 2014). "Constitutional errors must be found harmless beyond a reasonable doubt, whereas reversal of a non-constitutional error requires lesser proof." *Id.*

## A.  False Statements About Identity

Shortly after Elsheikh was captured by the SDF, DOD analysts participated in his biometric processing, a standard procedure for all detainees. In addition to being photographed and fingerprinted, detainees were asked to state their name, place of birth, and related biographical information. They were also asked basic questions about the circumstances surrounding their capture.

As noted earlier, Elsheikh lied when answering some of these initial questions. He responded in Arabic, saying that his name was "Suhayb Abdullah Jasim al-Salih," that he was from Yemen, and that he did not speak English. He stated that he had been captured with a group of other individuals en route to Turkey, and although he admitted that Kotey was captured at the same time, he provided a different name for Kotey (the same false name that Kotey provided when asked). The falsity of these responses came to light after the men's fingerprints were processed.

8

Before trial, and over Elsheikh's objections, the Government moved *in limine* to establish the admissibility of evidence relating to his and Kotey's false responses to those biometric-processing questions.

The district court granted the Government's motion, holding that the routine booking exception to *Miranda* applied to the circumstances presented. *United States v. Elsheikh*, 578 F. Supp. 3d 752, 778–80 (E.D. Va. 2022). This exception derives from the Supreme Court's articulation of what constitutes a "custodial interrogation" in which *Miranda* warnings are required. Specifically, the Court has defined "interrogation" to encompass "any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police know are reasonably likely to elicit an incriminating response from the suspect." *Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (1990) (plurality opinion) (emphasis added). The emphasized language highlights a well-recognized but relatively little-developed exception to *Miranda* "for routine booking questions securing 'biographical data necessary to complete booking or pretrial services.'" *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) (quoting *Muniz*, 496 U.S. at 601)). In the district court's view, the routine booking exception applied to Elsheikh's false identity responses because they were made in a "closely analogous" context and the questions served the same administrative goals. *Elsheikh*, 578 F. Supp. 3d at 779.

On appeal, Elsheikh reiterates his argument that admission of this evidence was inadmissible because the wartime locale is not analogous to a routine domestic police booking. In addition, he contends that, in this particular case, correctly answering questions about his identity would have provided potentially inculpatory information—that he was

9

an individual believed to be one of the Beatles. For both reasons, Elsheikh argues that the routine booking exception did not apply and, since he responded to the questions without the benefit of *Miranda* warnings, his answers should have been suppressed.

Having reviewed the record, we conclude that even if we assumed that the routine booking exception did not apply for any reason, any error in the admission of Elsheikh's responses would be harmless. "In assessing whether a constitutional error was harmless, we determine whether the admission of the statement[s] at issue was harmless beyond a reasonable doubt, such that it is clear that a rational fact finder would have found the defendant guilty absent the error." *United States v. Watson*, 703 F.3d 684, 698 (4th Cir. 2013) (cleaned up). "The test . . . is not whether laying aside the erroneously admitted evidence there was other evidence sufficient to convict beyond a reasonable doubt . . . , but, more stringently, whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Thompson v. Leeke*, 756 F.2d 314, 316 (4th Cir. 1985) (cleaned up). In *Arizona v. Fulminante*, 499 U.S. 279 (1991), the Supreme Court "identified three considerations in finding whether admissions of statements given by a defendant in violation of the Fifth Amendment would survive harmless error: (1) the importance of the statement to the government's case; (2) the impact on credibility of other evidence; and (3) the admission of prejudicial evidence based solely on the admission of the statement," *United States v. Giddins*, 858 F.3d 870, 885–86 (4th Cir. 2017). The Government bears the burden of showing "that the admission of the [defendant's statements] did not contribute to [his] conviction." *Fulminante*, 499 U.S. at 296.

10

The Government has met its burden here. Although the evidence of Elsheikh's false identity statements provided *some* evidence probative of Elsheikh's consciousness of guilt, it was not a significant part of the Government's case relevant to that issue or any other matter leading to his convictions. The challenged trial testimony involved less than ten pages of trial transcript out of thousands. Moreover, the evidence was freestanding, meaning that it did not allow for the introduction of any other evidence in the case, nor did it buttress or undermine any other evidence. Most significant to our determination, the admission of this evidence was cumulative of other direct and circumstantial evidence establishing Elsheikh's guilt, which included extensive testimonial and documentary evidence as well as his own admissions to his interactions with Emwazi, Kotey, and ISIS hostages. On this record, we can readily conclude that "it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict absent [any] error." *United States v. Camacho*, 955 F.2d 950, 955 (4th Cir. 1992). Thus, even if admission of this evidence was erroneous, any error was harmless and does not require reversal and remand.

## B.     Statements to FBI Agents

To better understand the concerns surrounding the admissibility of Elsheikh's post-*Miranda* warnings statements to FBI agents, we begin with a brief overview of the relevant law. The Supreme Court held in *Miranda* that, as a general matter, "certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted in evidence." *Dickerson v. United States*, 530 U.S. 428, 431 (2000); *see also Oregon v. Elstad*, 470 U.S. 298, 317 (1985) ("When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers

11

received be presumed compelled and that they be excluded from evidence at trial in the [prosecution's] case in chief."). The "administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the [pre-*Miranda*] statement." *Elstad*, 470 U.S. at 314. Thus, the admissibility of the individual's post-*Miranda* statements turns on whether "the surrounding circumstances and the entire course of police conduct with respect to the suspect" demonstrates that they were "voluntarily made." *Id.* at 318.

In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court held that law enforcement intentionally frustrated the effectiveness of mid-questioning *Miranda* warnings by intentionally withholding them, obtaining a confession, and then immediately providing warnings and requestioning the defendant using the same questions to obtain a "*Mirandized*" confession, *id.* at 604–05. But the Supreme Court's reasoning for its conclusion was split and, as we've previously recognized, Justice Kennedy's concurring opinion, which provided the narrowest grounds for the holding, "represents the holding of the *Seibert* Court." *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005). In Justice Kennedy's view, *Elstad*'s voluntariness standard should ordinarily apply to coordinated two-step interrogations (the first part being un-*Mirandized* and the second following *Miranda* warnings). He stated that a separate analysis was required "*only* in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). In the event of such a "deliberate two-step strategy," Justice Kennedy concluded that "postwarning statements that are related to prewarning statements must be

12

excluded unless curative measures are taken before the postwarning statement is made." *Id.* Those curative measures must "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver," and could include things such as "a substantial break in time and circumstances" to allow a suspect "to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.*

Turning to what occurred in this case, from late January 2018 to March 7, 2018, DOD investigators interviewed Elsheikh twenty-six times to gather intelligence relating to ISIS operations.[6] *Miranda* warnings were not provided. During the interviews, Elsheikh "provided extensive and detailed answers which established [his] involvement in the activities of ISIS, including the hostage-taking conspiracy alleged in the Indictment." *Elsheikh*, 578 F. Supp. 3d at 760. It is undisputed that no evidence gathered during these DOD-led interviews was admitted at trial against Elsheikh.

But the Government did (successfully) seek to introduce evidence gathered during Elsheikh's subsequent interviews with FBI agents. Twenty days after the last DOD interview, on March 27, 2018, two FBI agents interviewed Elsheikh for law-enforcement purposes. They spoke with him again the following day, March 28. The record shows that even before that interview took place, the FBI interrogators had taken measures to insulate

---

[6] The DOD investigators were distinct from the DOD analysts who participated in the initial biometric screening process.

Further, the record shows that these interviews all occurred under the auspices of the DOD regardless of which agency of the United States Government employed the interviewers. More important than their agency affiliation, all individuals identified here as the "DOD investigators" were distinct individuals from the FBI interrogators.

13

themselves from the DOD investigators and from any information gathered as part of the DOD interviews. They also asked the SDF to provide a different interview room from the room the DOD used, though the record is not clear on whether a different room was actually provided on each occasion.

At the outset of the interview, FBI Special Agent John Chiappone read through and provided Elsheikh a written copy of an Advice of Rights form that set out modified *Miranda* warnings. The modifications *added* language to the standard *Miranda* warnings to highlight how any interrogation that followed after these warnings differed from prior interviews. To that end, the form explained: "you may have already spoken to others from the U.S. Government. We do not know what, if anything, they said to you, or what you said to them. . . . *We are starting anew.* You do not need to speak with us today just because you have spoken with others in the past." J.A. 3648 (emphasis added). Likewise, the form distinguished that although prior statements "likely . . . will not be useable against you in a U.S. court[, a]nything you now say can be used against you in a U.S. court." J.A. 3648. The form explained that Elsheikh had the right to speak to a lawyer or have one present during questioning and that, regardless, he could decide whether to answer any questions or "stop answering at any time." J.A. 3648.

Agent Chiappone testified that after he read through the Advice of Rights form, Elsheikh's sole question was what "starting anew" meant. This question led him to elaborate on the division between anything Elsheikh may have said previously to other United States personnel—which likely could not be used against him in a criminal prosecution—and anything he may now tell the FBI agents—which could.

14

Elsheikh indicated that he understood his rights, and although he declined to sign the form, he agreed to answer some questions. Accordingly, Agent Chiappone signed the form as the witness to Elsheikh having been read his rights. Throughout the interview that followed, Elsheikh selectively answered questions, sometimes providing thorough answers and sometimes declining to answer questions or elaborate. A comparison between the information he provided to DOD interviewers and the FBI agents also demonstrates that Elsheikh was more forthcoming with the DOD than he chose to be with the FBI.

Before trial, Elsheikh moved to suppress statements he made to the FBI interrogators, arguing that the *Miranda* warnings were ineffective because the DOD and the FBI orchestrated a two-step interview process designed to undermine the effectiveness of the warnings and lull him into making incriminating statements.

The district court denied Elsheikh's motion on two independent grounds. First, it rejected the premise of Elsheikh's motion that the DOD and FBI "deliberately orchestrated a two-step interview process in a calculated way to undermine the *Miranda* warning." *Elsheikh*, 578 F. Supp. 3d at 772 (cleaned up). As support, it pointed to the "starkly different needs of different agencies within the U.S. government" as well as the precautionary measures taken to avoid communications and interactions that demonstrated an intentional *lack* of collusion between the DOD personnel and the FBI agents. *Id.* at 773. In light of this conclusion, the court held that the usual (*Elstad*) standard for admissibility of post-*Miranda* warnings applied and the record supported the conclusion that Elsheikh's "statements to the FBI were knowing and voluntary" and thus admissible against him at trial. *Id.*

15

Second, and alternatively, the district court held that "even assuming [that] the United States deliberately employed a two-step strategy to undermine the *Miranda* warnings," Elsheikh's statements would be admissible under the standard set out in Justice Kennedy's *Seibert* concurrence. *Id.* at 774. In short, the court found that the FBI agents questioned Elsheikh twenty days after his last DOD interview; they clearly and plainly described that they were "starting anew" and that this interview would be different from any prior ones; and they did not know—let alone question Elsheikh about—any statements he'd made during the earlier DOD interviews. Following the reasoning of the closely analogous application of the *Seibert* concurrence in *United States v. Khweis*, 971 F.3d 453 (4th Cir. 2020), the district court concluded that these circumstances were sufficiently curative to demonstrate that a reasonable person "would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Elsheikh*, 578 F. Supp. 3d at 772 (quoting *Seibert*, 542 U.S. at 622).

On appeal, Elsheikh contends the district court misapplied Justice Kennedy's *Seibert* analysis and that the DOD and FBI's coordinated interrogation intentionally sought to undermine the effectiveness of the *Miranda* warnings.[7] As support, he suggests that the

---

[7] Elsheikh's appellate briefing essentially ignores the district court's first ground for denying his motion—its conclusion that *Elstad* rather than *Seibert* applied under the circumstances presented. Instead, his briefs focus on why there were insufficient curative measures in place to ensure that Elsheikh's rights were not violated. Seizing on Elsheikh's failure to directly challenge an alternative basis for the district court's holding, the Government urges us to deem any challenge to this alternative ground waived and thereby avoid any discussion of the merits. We have carefully considered the Government's argument and Elsheikh's obligation to "develop" the arguments supporting each issue raised in his opening brief. *See* Fed. R. App. P. 28(a)(8)(A).
(Continued)

16

twenty-day gap in time between DOD and FBI interviews was not a sufficient break to satisfy *Seibert* and *Khweis* because there had also been increasing gaps occurring between the prior DOD interviews. Elsheikh maintains this factor would give rise to a reasonable inference that he would not appreciate the significance between those gaps and the later twenty-day gap before the interview with the FBI agents. He also points to the Government's inability to confirm that the interviews occurred in different rooms and asserts that the interviews also involved an impermissible crossover of personnel because some of the same SDF guards were present during both DOD and FBI interviews. In addition, Elsheikh points to an email in the record that lists potential strategies to use in the FBI interview, one of which was to "[d]ownplay [the] Advice of Rights." S.J.A. 2. He further claims the FBI did not honor his request to have an attorney present during the post-*Miranda* interview. And, in broader terms, he argues that the district court repeatedly and unreasonably disregarded evidence in his favor and failed to undertake the requisite *Seibert* analysis.

Having reviewed the record and the relevant case law, we discern no error in either of the district court's grounds for denying Elsheikh's motion. First, the record does not

---

While the Government's argument has some force, we decide to exercise our discretion to overlook Elsheikh's omission and address fully this important issue challenging the constitutional protections afforded to him during the investigation that led to his criminal prosecution. Of particular influence, we acknowledge that the *Seibert* issue Elsheikh argues at some length necessarily rests on the threshold premise that his rights were violated by a coordinated two-step interrogation, such that Justice Kennedy's controlling opinion governs resolution of the admissibility of Elsheikh's statements to the FBI. Under the circumstances presented, we believe it is appropriate to address this issue in full on the merits.

support the conclusion that the DOD and FBI coordinated their interview process "in a calculated way to undermine the *Miranda* warning," *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment), such that the admissibility of Elsheikh's statements is subject to Justice Kennedy's analysis in *Seibert*. To the contrary, the record uniformly supports the district court's finding that the DOD and the FBI did the opposite of coordinating "in a calculated way to undermine the *Miranda* warning." The FBI agents took numerous affirmative measures to isolate themselves from both the personnel involved in and the information disclosed during the earlier DOD interviews. What's more, the interviews themselves had entirely different characters. The DOD interviews took place over a three-month period and involved twenty-six separate encounters that focused on "a wide panoply of subjects related to military intelligence: hostage locations, ISIS's infrastructure and capabilities, the identities of ISIS members, and so on." *Elsheikh*, 578 F. Supp. 3d at 773. In contrast, the two days of FBI interviews delved into matters directly pertinent to a possible criminal prosecution. *Id.* These circumstances do not even come close to the sort of calculated staging that the Supreme Court disapproved of in *Seibert*. There, the law enforcement officer questioned the defendant "for 30 to 40 minutes" without the benefit of *Miranda* warnings. *Seibert*, 542 U.S. at 604–05. After the defendant confessed, the same officer gave her a "20-minute coffee and cigarette break" before returning. *Id.* at 605. He read the defendant her *Miranda* warnings, obtained a waiver, and then "confronted her with her prewarning statements," which she admitted to, resulting in a "*Mirandized*" confession. *Id.* That is the sort of interrogation technique *calculated* to undermine the effectiveness of a *Miranda* warning under *Seibert* and it does not have any parallel on the record before us.

18

For this reason, the district court did not err in concluding that *Seibert*'s "curative effect" analysis has no application here. And, under the standard *Elstad* voluntariness inquiry, the record fully supports the court's conclusion that Elsheikh understood the Advice of Rights form and voluntarily decided which of the FBI agents' questions to answer. This conclusion alone would be sufficient grounds to reject Elsheikh's argument.

Given the nature of the case and Elsheikh's briefing, however, we will also consider the alternative basis for the court's denial of the motion—that even if *Seibert*'s analysis applied here, sufficient curative measures were undertaken. As the district court recognized, our decision in *Khweis* is instructive on this issue. There, the Court undertook Justice Kennedy's *Seibert* curative-measure analysis in the context of an interrogation of a defendant suspected of supporting foreign terrorism in Iraq. 971 F.3d at 455–56. He was interviewed by one team of FBI agents for intelligence-gathering purposes and then interviewed by a separate team of FBI agents for law-enforcement purposes. *Id.* At the outset of the law-enforcement interviews, the defendant had been provided with an Advice of Rights form, he waived his rights, and the Government sought to introduce the post-*Miranda* statements at trial. *Id.* at 456.

When the admissibility of those statements was challenged on appeal, the Court elected to assume that Justice Kennedy's curative-measure *Seibert* analysis would apply to the circumstances presented, and it concluded that sufficient curative measures had been undertaken to ensure that the defendant "would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* at 461 (citation omitted). As support for this conclusion, the Court cited nine considerations: (1) a ten-day gap between the two

19

stages of interviews, which was "a period longer than any break during the series of unwarned interviews"; (2) "the warned interviews were held in a different room than the unwarned interviews"; (3) "[e]ntirely different American and Kurdish personnel attended the" two sets of interviews; (4) the law-enforcement interviewers "did not receive any information about [the] intelligence interviews, nor did they ask [the defendant] about what he told [the intelligence interviewers]"; (5) the law enforcement interviewers "told [the defendant] they did not know what, if anything, he had said in prior interviews, a disclosure that would indicate a reset to a reasonable person in [his] position"; (6) the Advice of Rights form specifically explained that the defendant did not have to speak with them just because he had spoken to others in the past; (7) the Advice of Rights form explained that the interviewers were not interested in what the defendant had said in the past; (8) the Advice of Rights form "explicitly stated: 'We are starting anew'"; and (9) the law-enforcement interviewers had informed the defendant that his family had retained counsel for him in the United States. *Id.* at 461–62 (citation omitted). Given the totality, the Court concluded that these circumstances satisfied Justice Kennedy's concerns in *Seibert* and permitted the admission of the defendant's post-*Miranda* statements. *Id.* at 462.

If many of the factors set out in *Khweis* sound familiar, it's because the FBI had the benefit of that decision as they were preparing for their interview with Elsheikh and intentionally followed many of those protocols. Elsheikh's attempts to materially distinguish his record from the circumstances in *Khweis* fail. Both cases involved a gap between the intelligence-gathering and law-enforcement interviews that was longer than any gap that had previously occurred. In fact, the gap in this case is twice as long (twenty

20

days instead of ten) as existed in *Khweis*. Nor is Elsheikh persuasive in arguing that increased gaps between his prior DOD intelligence-gathering interviews should give rise to an inference that he was being lulled into a "trap" by which he'd misunderstand that the law-enforcement interviews constituted a break from what had occurred previously. In addition to ignoring other evidence directly contrary to his being thus misled, the longest gap between intelligence-gathering interviews was five days, with most occurring on back-to-back days or with a single day's gap. The twenty-day gap retains its curative effect here.

More importantly, the Advice of Rights form Elsheikh was presented with is nearly identical to the one presented to Khweis, so those factors all support the same conclusion in this case. Elsheikh was plainly and repeatedly informed of the difference between the two types of interviews, the legal significance of any statements he would make if he waived his rights going forward with the FBI interview, and that the FBI agents had no knowledge of what had been said earlier. Nor did the FBI agents confront Elsheikh with any statements he'd previously made during the DOD interviews. All of this constitutes significant evidence of curative measures, if required, rendering the *Miranda* warnings effective. Elsheikh's contention that Agent Chiappone downplayed the Advice of Rights form has no support in the record. He points solely to brainstorming notes from another FBI agent and speculates that this means it must have occurred. Against that speculation, both Agent Chiappone and the other FBI agent in the room testified that the Advice of Rights form was presented in a straightforward manner and Elsheikh's questions about it

21

were answered. There's no basis for concluding from this evidence that they "downplayed" the Advice of Rights form.[8]

To be sure, there are some differences between this case and *Khweis*. It's not known, for example, whether the same room was used for both sets of interviews in this case, and it's also possible that the same SDF guard was present during some of the intelligence-gathering and law-enforcement interviews. While we've previously remarked on both being relevant curative measures, we've never indicated that they are indispensable to reaching that result. And here, there's no evidence that the overlapping location or SDF guard would give rise to any unique coercive effect that undermines the other factors which more directly bear on whether there was impermissible collusion. As such, we do not find these marginal differences significant enough to call into question the sufficiency of the curative measures undertaken in this case.

Considering the record as a whole, we conclude that the district court did not err as to its second basis for denying Elsheikh's motion. The DOD and FBI's curative measures were sufficient to underscore the differences in the interviews so that a reasonable person in Elsheikh's position would have readily understood "the import and effect of the *Miranda* warning and the *Miranda* waiver." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the

---

[8] As to Elsheikh's alleged request to have an attorney present during the interviews, the only evidence that Elsheikh asked for an attorney when presented with the Advice of Rights form is his sworn declaration. He did not testify on this matter during the hearing, while the FBI agents did testify to the contrary. Moreover, the FBI agents represented that when Kotey was presented with the same Advice of Rights form, he *did* invoke his right to an attorney, and they immediately stopped the interview. On this record, the district court did not clearly err in finding that Elsheikh did not invoke that right when speaking with the FBI agents.

judgment). As such, the district court did not err in concluding that Elsheikh's waiver was knowing and voluntary and that the post-*Miranda* statements he made to FBI agents were admissible.

## C. Statements During Media Interviews

During his detention, Elsheikh participated in multiple interviews with journalists, including 2019 media interviews with CNN, *The Washington Post*, ITV News, a Kurdish news outlet, and documentarian Sean Langan (who testified at the trial). Some were conducted alone and many with Kotey. During the media interviews, Elsheikh made statements that were admitted against him at trial regarding a range of topics such as his upbringing in England, his friendship with Emwazi, his support for ISIS and its ideology, and (to a limited extent) his knowledge of and participation in ISIS's hostage activities.

Before trial, Elsheikh moved to suppress those statements, arguing that they were involuntarily made as a result of physical abuse he endured while in SDF custody. In support of his motion, Elsheikh submitted his declaration alleging that he was regularly and repeatedly beaten by SDF guards and that he agreed to participate in the media interviews—and to make the statements that he did during them—only because he had been threatened with further beatings if he did not comply.

After a multi-day hearing that included classified testimony in a closed courtroom, the district court denied Elsheikh's motion. *Elsheikh*, 578 F. Supp. 3d at 774–78; *see also*

*id.* at 759–70.[9] The court concluded that Elsheikh's claim of abuse was "supported by little more than [his] own uncorroborated words, and is rebutted by a great deal of credible witness testimony and other record evidence." *Id.* at 776. It found credible the various Government witnesses who interacted with Elsheikh throughout his SDF detention, none of whom observed signs of beatings, malnourishment, or other mistreatment of the type Elsheikh maintained that he had faced. The court also found credible the testimony of numerous witnesses regarding the process for coordinating media interviews with SDF detainees, including the ability of detainees to control whether and how to participate in them. Lastly, the district court pointed to the substance of Elsheikh's statements to different questioners at different times as proof that he appeared to be free to be more or less forthcoming as *he* chose throughout the time of his detention.

"When *Miranda* warnings are unnecessary, as in the case of [statements made to non-government actors, the Court] assess[es] the voluntariness of a defendant's statements by asking whether [they are] 'the product of an essentially free and unconstrained choice by its maker.'" *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). Assessing whether the "will has been

---

[9] We refer in this opinion only to unclassified testimony and the district court's unclassified memorandum opinion. But we have reviewed the entire record, including the classified testimony and memorandum opinion. We find nothing clearly erroneous in the district court's classified findings of fact or its related conclusions of law, but we have chosen not to expound upon the classified components of this case in this opinion given that neither party's arguments hinge on that part of the record or the district court's decision.

overborne" requires courts to consider "the totality of the circumstances, taking into account characteristics of the accused, and details of the [interview]." *Id.*[10]

We review the district court's "legal conclusion as to the voluntariness of an accused's statements *de novo*, but its findings of fact on the circumstances surrounding the [statements] for clear error." *Id.* at 232 (cleaned up). The Court "particularly defer[s] to a district court's credibility determinations, for it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." *Id.* (cleaned up). But "even when findings of fact are not based on observations of credibility, but rather on undisputed evidence or on entirely documentary evidence, appellate courts must nonetheless defer to the trial court's factfinding function." *United States v. Stevenson*, 396 F.3d 538, 543 (4th Cir. 2005); *see also id.* at 544 ("The 'clearly erroneous' test does not derive solely from the trial judge's superior opportunity to assess the credibility of witnesses; it also reflects and preserves the proper relationship between trial courts and courts of appeal." (citation omitted)).

Under the clearly erroneous standard, we must uphold a district court's factual findings unless we are "left with the definite and firm conviction that a mistake has been made" based on the entire record evidence. *United States v. Ferebee*, 957 F.3d 406, 417

---

[10] Exclusion is not always necessary when the allegedly coercive actions were committed by a non-Government actor. *See, e.g.*, *Abu Ali*, 528 F.3d at 228–29 (discussing the analysis that applies when the allegedly coerced statements were made when the defendant was in the custody of a foreign authority but United States personnel "participated" in aspects of the custody). Nonetheless, we assume, without deciding, that this situation could require us to consider the admissibility of the statements under the above-stated principles.

(4th Cir. 2020) (citation omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* (citation omitted). At bottom, "[f]or a factual finding to be clearly erroneous, [it] must be against the *clear weight* of the evidence considered as a whole." *Id.* (cleaned up).

We reject Elsheikh's argument that the district court failed to adequately explain the basis for its decision. The opinion speaks for itself, and the district court ably recounted the evidence presented during the hearing, made related factual findings as appropriate, and then reasonably concluded that the record before it did not support the conclusion that Elsheikh's statements during the media interviews were involuntary. The court similarly explained the bases for disbelieving Elsheikh's contrary account.

Elsheikh's challenge to the substance of the court's factual findings fails because he has not shown that they were clearly erroneous. Numerous witnesses across nationalities and professions testified credibly—and subject to cross-examination—that Elsheikh alone determined whether to participate in media interviews, decided how or whether to respond to questions posed by the press, and could even terminate an interview mid-course at his discretion. That testimony was backed up by the substance and timing of Elsheikh's statements during the media interviews in question, which exhibited decision-making and discretion in what information he disclosed when and to whom.

Similarly, numerous witnesses across nationalities and professions testified credibly—and subject to cross-examination—that they'd observed and interacted with

26

Elsheikh at various points throughout his SDF detention and had never seen or received information indicating that he had been mistreated or abused. The substance of the media interviews supports that witness testimony: save for one interview in which Elsheikh appeared "fatigued and unfocused," *Elsheikh*, 578 F. Supp. 3d at 767, he consistently appeared alert, engaged, and responsive. And he did not appear or move in a way that suggested beatings or injuries from abusive treatment.

Nothing Elsheikh points to leaves us with a "definite and firm conviction that" the district court mis-weighed the record before it when deciding to credit this evidence over his own. He points first to his sworn declaration alleging abusive treatment, which was submitted to the district court. The district court was well within its right to view the substance of Elsheikh's declaration—which was never subjected to cross-examination— as less credible than the contrary testimony of the many witnesses who testified at the suppression hearing and did subject themselves to extensive cross-examination. As Elsheikh's counsel acknowledged during oral argument, nothing would have prevented Elsheikh from testifying in a limited way at the suppression hearing. *See United States v. Dickerson*, 655 F.2d 559, 561–62 (4th Cir. 1981) (rejecting defendant's argument that he could not testify at a suppression hearing because of possible prejudice to his Fourth and Fifth Amendment rights); *see also Simmons v. United States*, 390 U.S. 377, 394 (1968) ("When a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at the trial on the issue of guilt unless he makes no objection."). Certainly, there may be some risk associated with deciding to testify at any point in a proceeding, but given that defendants

can testify at a suppression hearing without it being used against them at the trial, Elsheikh could have sought to elaborate on the substance of his declaration by doing so there. The district court was well within its discretion to take the limited substance of Elsheikh's declaration and the manner in which he presented that evidence to the court as a reason for crediting the other, extensive testimony over Elsheikh's declaration. Similarly, Elsheikh pointing to Kotey's similar representations at various times in the past doesn't move the needle in his favor given that Kotey had not made a sworn statement or subjected himself to cross-examination. Lastly, Elsheikh points to a document relaying his and Kotey's prior self-reports of abuse. Obviously, this does not offer independent *corroboration* of his declaration's broad assertions, but instead suffers the same failing given that its account originated from him and Kotey.[11] Under these circumstances, we do not discern clear error in the district court's factual findings underpinning its conclusion that Elsheikh voluntarily made statements during his various media interviews.

At bottom, Elsheikh did not come forward with sufficient evidence to carry his burden of showing that his will had "been overborne and his capacity for self-determination critically impaired," *Abu Ali*, 528 F.3d at 232 (citation omitted), when he participated in

---

[11] Elsheikh points to a record created shortly after his transfer to DOD custody that notes his and Kotey's self-reports of physical abuse by SDF. This record does not independently corroborate Elsheikh's statements, however, because he and Kotey were the source of that information. Moreover, while Elsheikh claimed that he suffered permanent damage to a shoulder socket after SDF guards kicked him, a medical examination performed upon Elsheikh's transfer to DOD custody reported he possessed a full range of motion in his upper extremities.

28

the media interviews. As such, he has not shown that the district court erred in determining that those statements were voluntary and thus admissible against him.

### D. Statements Made By Unavailable Hostages

Before trial, the Government sought a ruling on the admissibility of "testimony, letters, and audio and video recordings containing out-of-court statements by deceased or otherwise unavailable victims of the alleged hostage-taking conspiracy." *United States v. Elsheikh*, 598 F. Supp. 3d 363, 366 (E.D. Va. 2022).[12] Elsheikh objected, and after a hearing, the court deferred ruling to allow for the development of the trial record.

In due course, the district court allowed the admission of this evidence based on the forfeiture-by-wrongdoing exception to the hearsay rule. *Id.* at 367. Under that rule, set out in Rule 804(b)(6) of the Federal Rules of Evidence, otherwise inadmissible hearsay may be admitted upon a showing of three things: "(1) the defendant engaged or acquiesced in wrongdoing (2) that was intended to render the declarant unavailable as a witness and (3) that did, in fact, render the declarant unavailable as a witness." *United States v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005). The Government bears the burden of establishing, by a preponderance of the evidence, that the exception applies. *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012).

On appeal, Elsheikh challenges just one part of the court's determination—the second, regarding intent—and the court's finding that a motive for the wrongdoing at issue

---

[12] Six of the hostages are confirmed dead and a seventh is presumed to have been killed. All seven victims' actual unavailability is not disputed on appeal. *See Elsheikh*, 598 F. Supp. 3d at 383–85. After all, no beheaded witness is available to testify at trial.

here was to render the declarant unavailable as a witness. He argues that the record unequivocally establishes that the Beatles killed hostages only for political and ideological reasons and that no evidence suggests that they did so to prevent them from testifying against them in a future trial. In his view, the court misapplied the exception by improperly expanding its scope to the circumstances presented, and the evidence should not have been admitted. We disagree with Elsheikh's argument.

The Supreme Court has previously recognized that the intent requirement is satisfied by proof that the defendant's wrongdoing was "designed to prevent the witness from testifying." *Giles v. California*, 554 U.S. 353, 359 (2008) (emphasis omitted). Thus, it is insufficient that the wrongdoing have the *effect* of rendering the witness unavailable; the wrongdoing must be motivated in some part to obtain that end. *Id.* at 361–62. But this requisite intent does not need to be the only or even the chief motive for the wrongdoing. In *United States v. Jackson*, we expressly rejected that notion, holding instead that the exception applies "even when a defendant has multiple motivations for harming a witness." 706 F.3d 264, 266 (4th Cir. 2013).[13]

This case law and the record fully support the district court's decision to admit the unavailable hostages' hearsay statements under the forfeiture-by-wrongdoing exception.

---

[13] The Court has also held that "traditional principles of conspiracy liability are applicable within the forfeiture-by-wrongdoing analysis" such that the exception applies when a "defendant's co-conspirator engaged in the wrongdoing that ultimately rendered the declarant unavailable as a witness." *Dinkins*, 691 F.3d at 384. Elsheikh does not take issue with this principle, which allows the Court to consider the full scope of the conspirators' wrongdoing—including Emwazi's wielding the sword—to determine if the exception properly applies in this case.

30

The district court reasonably pointed to multiple features of this case supporting that conclusion.

First, the record shows that the Beatles took "extraordinary steps" to hide their identities from their hostages, including by wearing balaclavas and gloves and ordering the hostages not to look at them or to face away from them during interactions. *Elsheikh*, 598 F. Supp. 3d at 380; *see also id.* at 381–82. This evidence strongly suggests that the Beatles did not want their hostages to be able to identify them. Second, the Beatles took measures to "instill a culture of silence among current and former hostages," routinely beating and threatening abuse intended to dissuade them from seeking outside help or, in the case of released hostages, from speaking with governments or the media about their experiences or captors. *Id.* at 381.

Second, the record showed that the Beatles had strong ties to the United Kingdom and its criminal justice systems. In particular, Elsheikh had grown up in the United Kingdom, received training as a British Army Cadet, and had committed crimes for which he'd been arrested and obtained the services of a solicitor. Elsheikh's background thus demonstrates his personal familiarity with the potential, even the likelihood, of facing criminal prosecution for the activities in support of terrorism.

Third, and last, messages Elsheikh sent to his brother, a resident of London, depicted his awareness that the types of activities the Beatles were involved in could result in criminal prosecution. *See id.* For example, Elsheikh sent his brother photographs of himself posing with a firearm and identifying as a fighting member of ISIS in Syria. He also sent photographs depicting severed human heads on poles (none of whom were identified as

31

the hostages named as part of this case). And he left a voice message assuring his brother that he had not taken the photograph of the decapitated individuals, proclaiming, "I am totally innocent of any crimes, and er . . . I have no comment further than that and if you want to ask me any more questions, you can just speak with my lawyer." *Id.* (alteration in original).

Each link in this evidentiary chain removes any doubt that the district court did not abuse its discretion in concluding that the deceased hostages' statements were admissible under the forfeiture-by-wrongdoing exception. In short, the record shows that Elsheikh was aware that the activities of the Beatles could subject them to criminal prosecution and that they took measures to reduce the likelihood of that occurring by preventing their hostages from identifying them and intimidating their hostages to dissuade them from reporting their activities. This evidence allows for the conclusion that *a* reason why the Beatles killed some of their hostages was to prevent the hostages from being able to assist with any future criminal prosecution. *See, e.g.*, *Giles*, 554 U.S. at 377 (citing domestic violence as a situation in which an abusive relationship may culminate in murder such that the exception may apply to the victim's hearsay statements because "the [wrongdoing of murder] expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution"). On this record, therefore, the district court did not abuse its discretion in allowing admission of the unavailable hostages' statements.

32

E.  Admissibility of Doe's Testimony

One of the deceased hostages named in the indictment was Kayla Mueller. The record shows that after months of being held by the Beatles, Mueller was turned over to the control of other members of ISIS who subsequently enslaved, raped, and killed her. During that post-Beatles period, Mueller was held captive with a woman ("Jane Doe") whom the Government sought to have testify against Elsheikh.

Before trial, Elsheikh moved in limine to exclude Doe's testimony about any events involving her captivity before her joint captivity with Mueller. He asserted they did not meet the threshold for relevance under Federal Rules of Evidence 401 and 402 and that they were unfairly prejudicial under Federal Rule of Evidence 403.

The district court denied Elsheikh's motion, concluding the evidence was both relevant and not unfairly prejudicial. In the court's view, Doe's brief proposed testimony about her capture and detention before meeting Mueller was appropriate "foundational testimony from Doe regarding her capture and treatment by ISIS," "provid[ing] context for the jury to explain why Doe was in ISIS captivity and, specifically, how she came to be with Mueller." No. 1:20-cr-00239-TSE, Dist. Ct. Docket No. 260, at 3–4 (E.D. Va. Mar. 24, 2022). The court also rejected Elsheikh's contention that this testimony fell outside the charged conspiracy, observing that Doe's unchallenged testimony about her time with Mueller was "part and parcel of the ISIS conspiracy" to "provide material support" to that designated terrorist organization. *Id.* at 4–5. As for unfair prejudice, the court noted that the limited nature of the testimony proposed would cabin any concern on that score and

33

that any connection the jury may draw between Doe's experiences and the charged offenses was "hardly *unfair*" prejudice given the material-aid conspiracy at issue. *Id.* at 6.

While the Federal Rules of Evidence state that "[i]rrelevant evidence is not admissible," Fed. R. Evid. 402, they set a fairly low bar for relevance. Under Rule 401, "[e]vidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[] and . . . the fact is of consequence in determining the action." That said, even relevant evidence should be excluded under Rule 403 if it is "*unfairly* prejudicial," meaning that "there is a genuine risk that the emotions of a jury will be excited to irrational behavior[] and . . . this risk is disproportionate to the probative value of the offered evidence." *United States v. Walker*, 32 F.4th 377, 394 (4th Cir. 2022) (second alteration in original) (emphasis added) (citation omitted). But a district court's assessment of admissibility under Rules 401 and 403 is afforded deference and "will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." *United States v. Williams*, 445 F.3d 724, 732 (4th Cir. 2006) (Rule 403) (cleaned up).

We discern no abuse of discretion in the district court's decision to allow Doe to testify briefly as to the circumstances of her own capture and time in captivity before being detained with Mueller. What happened to Mueller was part of the charged conduct, from her initial captivity with the Beatles through her death with other members of ISIS when she was held with Doe. Elsheikh has never challenged that basic premise. To set the stage for the unchallenged part of Doe's testimony relating to her time in captivity with Mueller, the district court appropriately allowed the Government to ask Doe briefly about the

34

circumstances that led to her being held captive with Mueller. In other words, the challenged part of her testimony provided useful context for the unchallenged part of her testimony. *See United States v. Miller*, 61 F.4th 426, 432 (4th Cir. 2023) (observing, in the context of Rule 403's balancing test, that evidence can be probative because it preserves the "narrative integrity of the Government's case" and "satisfies the jurors' expectations" by filling in evidentiary gaps that would otherwise arise about background information such as how individuals know each other (cleaned up)). The challenged part of Doe's testimony was also directly probative to one of the charges against Elsheikh. Because he was charged with a material-aid conspiracy, evidence about how the Beatles operated in hand with other members of ISIS seamlessly integrated into the overarching picture, even if Elsheikh was not personally accused of taking part in Doe's captivity. It thus met the threshold requirement of being relevant to the Government's case. *See* Fed. R. Evid. 401.

In addition, the district court conducted an appropriate Rule 403 assessment when it determined that, in addition to being relevant evidence, Doe's testimony was also not unfairly prejudicial. As we have long recognized, "all incriminating evidence" is "prejudicial" in some way, but that does not mean that it needs to be excluded under Rule 403. *United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995). Here, the admission of brief testimony about *other* members of ISIS holding Doe captive discussed conduct no "more sensational or disturbing than the crimes with which [Elsheikh] was charged." *Id.* In sum, the admission of Doe's testimony did not run afoul of the governing evidentiary standards.

35

III.

The horrific acts the Beatles inflicted against United States and foreign nationals were well-documented in this trial and elsewhere. The trial record established Elsheikh's identity as a participant in that brutal scheme. Having thoroughly reviewed Elsheikh's specific challenges to the evidence admitted against him at trial, we conclude that no reversible errors occurred. Elsheikh received the fair trial guaranteed to him by our Constitution and laws. We therefore affirm his convictions and life sentences.

*AFFIRMED*