**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-4347**

———————

UNITED STATES OF AMERICA,

> Plaintiff – Appellee,

v.

DONALD GENE FERGUSON, II,

> Defendant – Appellant.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Mark S. Davis, Chief District Judge.  (2:22-cr-00049-MSD-DEM-1)

———————

Argued: October 31, 2024                     Decided:  June 16, 2025

———————

Before DIAZ, Chief Judge, and RICHARDSON and HEYTENS, Circuit Judges.

———————

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Chief Judge Diaz and Judge Heytens joined.

———————

**ARGUED:**  Sebastiano Mario Lorello, ZOBY & BROCCOLETTI, PC, Norfolk, Virginia, for Appellant.  Elizabeth Marie Yusi, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.  **ON BRIEF:**  James O. Broccoletti, ZOBY & BROCCOLETTI, PC, Norfolk, Virginia, for Appellant.  Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

A jury convicted Donald Ferguson of sexually abusing his adopted daughter. *See* 18 U.S.C. § 2244(a)(5). Ferguson now protests that the trial court erroneously admitted the first nine and a half minutes of his adopted daughter's forty-five-minute forensic interview. But the district court did not abuse its discretion in admitting the evidence, which was relevant, not hearsay, and not unduly prejudicial. So we affirm.

## I.    Background

### A.    Facts

Ferguson adopted Jane Doe—so called to protect her anonymity—after he married Doe's mother, T.F. T.F. and Ferguson met in 2012 while working as civilians for the Department of Defense in Florida. Both had daughters from prior relationships. After the couple married in 2013, Ferguson adopted Jane Doe and T.F. adopted his daughter. Jane Doe quickly started referring to Ferguson as "dad." J.A. 164. Eventually, T.F. and Ferguson moved to Iwakuni, Japan, after T.F. accepted a new Defense position. But as they agreed at trial, their marriage was rocky—and Jane Doe noticed.

In the summer of 2019, when Jane Doe was 11, T.F. woke up to a text from Doe. Doe said, in part:

> Dad showed me his hot dog a week ago and made me touch it when I was half asleep when we were down stairs at first I didn't realize it but he grabbed my hand and put it directly on it. I almost cried, so I ran upstairs and fell asleep.

J.A. 173–75.

2

T.F. immediately spoke with Doe and removed her from their home. She then contacted a counselor, reached out to the Naval Criminal Investigative Service ("NCIS"), and got a restraining order against Ferguson. T.F. never confronted Ferguson with Doe's accusation; she just moved out and later filed for divorce. Shortly after Doe texted T.F. and T.F. alerted the authorities, Jane Doe met with NCIS Agent Hannah Gottardi—a criminal investigator specially trained to conduct child forensic interviews.

After investigating, the United States charged Ferguson with abusive sexual contact with a minor under the age of 12. *See* 18 U.S.C. §§ 2244(a)(5), 2241(c). The case proceeded to trial, where the video recording of Jane Doe's forensic interview with Agent Gottardi (identified as Trial Exhibit 3) was admitted into evidence.

## B.      Child Forensic Interviews and Protocols

As Agent Gottardi testified at trial, child forensic interviews ideally proceed under a protocol established by the National Children's Advocacy Center. That protocol divides such interviews into two stages, each composed of several distinct segments.[1] Three things are supposed to happen during stage one. First, the interviewer introduces herself to the child and builds rapport. Then, she explains the interview's rules. Last, she engages in "narrative practice"—asking the child to describe a nontraumatic event to show what level of detail the child's later responses about the traumatic event should include—and asks about the child's family. Stage two of a proper forensic interview, in turn, elicits a

---

[1] *See* National Children's Advocacy Center, *Forensic Interview Structure* (2020).

3

description of the sexual abuse, then asks follow-up and clarifying questions, and ends by returning to nontraumatic topics.

As Agent Gottardi testified, her interview of Jane Doe followed this protocol. Stage one, the first part of the video, lasted nine and a half minutes. And although the parties treat it as just one block of rapport-building evidence, that oversimplifies. This first stage consisted of three segments, which cover the protocol's stage-one requirements.

First, Gottardi introduced herself to Doe and built rapport. In this segment, Gottardi asked Doe questions about her hobbies and her school. Next, in the second segment, Gottardi explained the rules of the interview, to which Jane Doe responded with "yeses" and "okays." Those rules conveyed the following expectations of Doe:

1. To correct Gottardi if Gottardi repeats or says anything false
2. To refrain from guessing if the answer is unknown and instead say "I don't know"
3. To ask for clarification if the question is unclear
4. That "everything [said] in [the] interview" should be "true and real"

J.A. 270–71. In the last segment Gottardi returned to asking Doe nontraumatic personal questions, such as what she did earlier that day.

After all three segments of stage one (which again lasted nine and a half minutes), Gottardi turned to stage two, asking Jane Doe to describe the events she had disclosed to her mom. Like Doe's later trial testimony, her interview covered two abuse incidents.[2] One incident took place, at night, in Jane Doe's bedroom. Ferguson used to give her

---

[2] Jane Doe, in fact, described three during the forensic interview. But the district court ultimately excluded the description of the third incident of abuse.

4

backrubs to help her fall asleep.  During one such backrub, he exposed himself.[3]  The other incident, which is the one described above in the text message from Doe to T.F., took place on their living room couch.  This time Jane Doe and Ferguson were alone snuggling together, on a couch, sharing a blanket.  Ferguson made Doe touch him sexually.[4]

In the final portion of stage two, Jane Doe told Agent Gottardi about how she went to T.F. to disclose what Ferguson had done to her, about moving away from Japan, and answered Gottardi's follow-up questions.

## C.     Evidence, Arguments, and Judgment

This was a quick trial.  The government focused on testimony from Jane Doe and T.F.  It also introduced screenshots of their text messages and showed the jury the video recording of Doe's forensic interview (Trial Exhibit 3).  In its case-in-chief, the defense offered Ferguson's testimony.

The central issue in the case was witness credibility.  During Doe's cross-examination, Ferguson attempted to impeach her by suggesting that she made up her story.  He insinuated that Jane Doe fabricated her story to cause her mom and Ferguson to get a divorce.

The government planned to rehabilitate Jane Doe by showing the jury her forensic interview.  The defense conceded that it was admissible as a prior consistent statement under Fed. R. Evid. 801(d)(1)(B), but only if limited to "the portions of the [video] which

---

[3] The exact details of Ferguson's actions described at trial are omitted here.

[4] Doe provided explicit details in her interview and at trial.

5

relate to the impeached testimony." J.A. 205. But the defense denied that "impeaching a witness on one or two points [would] open the door for the entirety of the forensic interview to be played," arguing that the first nine and a half minutes were inadmissible as nonrelevant hearsay. *Id.* The government countered that the whole video—including the so-called "rapport-building" parts—was admissible as a prior consistent statement because it went to Doe's "credibility in general." J.A. 206.

After considering the question outside the jury's presence, the court ultimately admitted most of the video evidence. The court said that it wasn't "so concerned about the rapport-building portions" and was focused more on unfair prejudice under Fed. R. Evid. 403. J.A. 266. Having found that the evidence was not unfairly prejudicial, it then admitted the forty-five-minute video without further explanation or citation to any rule of evidence.

After it heard all this evidence, the jury convicted Ferguson.

## II.    Discussion

Ferguson challenges the admission of the first nine and a half minutes of the forensic-interview video. We find the district court reasonably exercised its discretion when it admitted this portion of the video. *See United States v. Ebert*, 61 F.4th 394, 403 (4th Cir. 2023).

### A.    Structure of the Evidence Rules

The starting point for any evidence question is relevance. Under the Federal Rules of Evidence, all relevant evidence is admissible unless it is barred by another rule of evidence, the Constitution, a statute, or a rule prescribed by the Supreme Court. Fed. R. Evid. 402. By contrast, if evidence is irrelevant, it is categorically barred. *Id.*

6

The rules of evidence tilt toward admissibility at every step.  Relevance itself is a low bar, requiring only that the evidence make a fact of consequence more or less likely to be true.  Fed. R. Evid. 401; David A. Sklansky & Andrea L. Roth, *Evidence: Cases, Commentary, and Problems* 18 (5th ed. 2020).  Famously described, "a brick is not a wall": That a piece of evidence does not by itself prove (or disprove) a point does not mean it is irrelevant.  1 Robert P. Mosteller et al., *McCormick on Evidence* § 185.2 (9th ed. 2025).

Though all evidence questions begin with relevance, they often end elsewhere. Other evidence rules bar some types of relevant evidence.  *See, e.g.*, Fed. R. Evid. 404 (limiting character evidence).  This appeal turns on two such bars.

First, Ferguson argues that the video's first stage contained hearsay, which is usually barred.  *See generally* Fed. R. Evid. 801 to 807.[5]  Hearsay is a notoriously slippery concept. Its classic definition is an "out-of-court statement[] offered for the truth of the matter asserted."  *United States v. Lewis*, 10 F.3d 1086, 1091 (4th Cir. 1993); *see also* Fed. R. Evid. 801(c) ("'Hearsay' means a statement[6] that:  (1) the declarant[7] does not make while

---

[5] The hearsay ban is justified on the policy grounds that factual disputes "should be decided based on live, sworn testimony, not secondhand accounts of what other people said outside of court."  Sklansky & Roth, *supra*, at 46.  This stems from the historical judgment that live testimony tested "in the crucible of cross-examination" produces reliable evidence.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004); *see also Raleigh's Case*, 2 How. St. Tr. 1, 15–16, 24 (1603) (also known as The Trial of Sir Walter Raleigh, Knight, For High Treason).

[6] A "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."  Fed. R. Evid. 801(a).

[7] A "declarant" is the person who makes a statement.  Fed. R. Evid. 801(b).

testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.").[8]  So one important question when assessing putative hearsay is what the statement was offered to prove.  Or, more specifically, whether it was offered to prove the truth of the matter asserted in it.  This matters because a statement is not hearsay under Rule 801(c)'s classic definition if it is offered for a nontruth purpose.  But Rule 801(d) excludes by fiat some statements that *do* satisfy the classic definition from the definition of hearsay—for example, statements by an opposing party and prior consistent statements.  Fed. R. Evid. 801(d).  Last, the federal rules identify a series of hearsay exceptions.  Statements in this class fall within Rule 801(c)'s classic definition, and outside Rule 801(d)'s definitional exclusions, yet still evade the prohibition on hearsay.  These exceptions can be found in Rules 803, 804, and 807.[9]

Second, Ferguson argues that the video's first stage should have been excluded under Rule 403.  This rule gives district judges discretion to exclude relevant evidence for a host of reasons—for instance, because the evidence is "needlessly . . . cumulative," threatens to cause unfair prejudice or undue delay, or risks confusing the issues in the case or misleading the jury.  But Rule 403 sets a high standard for exclusion, tilting yet again toward admissibility.  It is not enough that the evidence might cause one of these problems.

---

[8] As Rule 801 itself makes clear, "out of court" means a statement the declarant did "not make while testifying at the *current trial or hearing.*"  Fed. R. Evid. 801(c)(1) (emphasis added).

[9] Pragmatically there is no difference between an "exclusion" and an "exception."  *See* Sklansky & Roth, *supra*, at 93.  But as a technical matter, "exclusions" are nonhearsay and "exceptions" are admissible hearsay.

8

Instead, to qualify for exclusion, the evidence's probative value must be "substantially outweighed" by a "danger of" one of these concerns. Fed. R. Evid. 403. And because the Rule 403 inquiry is necessarily fact-specific and calls for judgment, a judge's Rule 403 decision receives heightened deference. *United States v. Elsheikh*, 103 F.4th 1006, 1026 (4th Cir. 2024); *United States v. Grossman*, 400 F.3d 212, 218 (4th Cir. 2005).

We evaluate the challenged evidence according to these rules, which logically proceed in turn. We first ask whether each segment of stage one of the video is relevant. Next, we ask whether the segment is barred by another rule, like the bar on hearsay. Within the hearsay inquiry there are three sub-questions: whether the evidence satisfies 801(c)'s classic definition; if it does, then whether a definitional exclusion applies; and if one doesn't, last whether an exception applies. Finally, if the evidence is relevant and not otherwise barred, we evaluate—with great deference—whether it still should have been excluded under Rule 403.

### B.    Rule 401 Relevance

Recall that in the first segment of stage one Agent Gottardi introduced herself to Jane Doe and built rapport. Trial Exhibit 3, pt. 1 at 0:00–2:18. In the middle segment, Gottardi explained to Doe the rules of the interview. *Id.* at 2:18–4:15. And in the final segment, Gottardi asked Doe to recall a nontraumatic event in detail. *Id.* at 4:15–9:27.

In the beginning and end segments, the subject matter of Jane Doe's answers is plainly irrelevant. Gottardi asked Doe, among other similarly trivial things, what type of

9

cereal she liked and what her dog's name was.  Needless to say, the answers to those questions do not make any fact of consequence more or less likely to be true.

Even so, these segments are relevant for a more subtle reason.  As the district court concluded and Ferguson does not challenge before us, stage two (her substantive allegations) of Jane Doe's forensic interview contains prior consistent statements about her abuse, offered to rehabilitate her after Ferguson attacked her credibility at trial.  And the segments of stage one are relevant to that rehabilitation effort because they show that Agent Gottardi's interview followed the NCAC protocol.  In Gottardi's words, that protocol requires a "structured" interview, designed to "elicit detail and memory recall of an event." J.A. 269.  So showing that Gottardi interviewed Doe in accordance with the protocol—a protocol designed to elicit accurate recall—made it more likely that the testimony Doe gave during stage two was reliable.  That satisfies Rule 401's relevance standard.[10]

The middle segment is more obviously relevant.  Although it, too, shows compliance with the protocol and thus enhances the credibility of Doe's later description of her abuse, it also matters that Gottardi explained the interview's rules to Doe.  Whether Doe understood that she was expected to correct incomplete answers and to tell the truth

---

[10] It is no argument against relevance that Gottardi also testified to the fact that the protocol was followed.  Whether evidence is relevant under Rule 401 turns not on whether it is duplicative—objections of that sort must be lodged under Rule 403. Sklansky & Roth, *supra*, at 18–19 (citation omitted).

logically impacted the likelihood that she was reliably and truthfully recounting what happened when she later described her abuse.

Relevance is an exceptionally low bar, and it was cleared here for all of the challenged evidence. So if no other rule barred the evidence, it was admissible.

### C.     Rule 801 Hearsay

Ferguson argues that, even if relevant, the rule against hearsay bars this evidence. The United States counters, reprising its argument from trial that the entire interview was admissible as a prior consistent statement under Fed. R. Evid. 801(d)(1)(B)(ii), a definitional exclusion from the hearsay bar. But the United States' approach is somewhat counterintuitive: Logically, before asking whether a hearsay exclusion applies, one would ask the antecedent question of whether the statements are hearsay under the classic definition. *See* Sklansky & Roth, *supra*, at 93. We do, and we conclude that the answer is no. Because the district court could have concluded that the statements were offered for nontruth purposes, we need not address the subsequent question of whether the exclusion applies.

As explained, the classic definition of hearsay is an "out-of-court statement[] offered for the truth of the matter asserted." *Lewis*, 10 F.3d at 1091; *see* Fed. R. Evid. 801(c). In other words, hearsay involves asking the jury to go through the following chain of logical inferences: The declarant said *x;* therefore, the declarant believed *x*; and, therefore, *x* is true. *See* Laurence H. Tribe, *Triangulating Hearsay*, 87 Harv. L. Rev. 957,

11

958–61 (1974); *see also* Sklansky & Roth, *supra*, at 51–52.  When evidence deviates from this series of inferences, it is not hearsay.

One way evidence sometimes deviates from this inferential path is that it is offered for some reason other than to show that "*x* is true."  Accordingly, whether a statement is hearsay depends on the purpose for which it is offered.  Nontruth purposes abound.  Take statements offered to show their effect on the listener,[11] statements that indirectly prove one's mental state,[12] or verbal acts (like defamation or demands for illicit payment) that are independently unlawful.[13]  *See* Sklansky & Roth, *supra*, at 53–65 (collecting cases). Thus, *why* a piece of evidence is offered matters.[14]

Here, the district court did not specify why it admitted the challenged evidence.  It admitted the second stage of the forensic interview as a prior consistent statement offered

---

[11] *See, e.g.*, *Campbell v. Boston Sci. Corp.*, 882 F.3d 70, 78 (4th Cir. 2018) (statement used to show notice).

[12] *See, e.g.*, *Lyons P'ship v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (statement used to show mistake or confusion).

[13] *See, e.g.*, *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999) (statement demanding money in exchange for testimony).

[14] Somewhat unintuitively, evidence can be both hearsay and nonhearsay in the same trial, depending on who offered it and why.
      To take an example, let's say a declarant, Smith, said "Jones," a celebrity, "sold defective products to her fans."  In a trial for defamation Smith might, as a defense, try to prove that her statement was true and therefore not defamatory.  Smith's statement, offered for this purpose, would be hearsay because it would be offered to prove the truth of the matter asserted in the out of court statement—that Jones did, in fact, sell defective products. But let's say Jones offered Smith's statement in the same trial.  She would obviously not be offering the statement for the truth of the matter asserted.  Her entire defense would depend on the matter asserted in the statement not being true.  Instead, she would be
(Continued)

12

by the government to rehabilitate Doe after a charge of fabrication. And it *may* have taken the same view of the first stage, treating that part, too, as a prior consistent statement because it supported Doe's testimony about what Ferguson did to her. The government urges us to adopt this rationale, arguing that this evidence qualifies as a prior consistent statement under Fed. R. Evid. 801(d). But we take no position on whether the interview's first stage qualifies as a prior consistent statement[15] because we see a more straightforward path to affirmance: The district court could have properly found that the interview's first stage did not contain any statements that met the classic definition of hearsay.

Evidence rulings may be affirmed if they are correct—whether the district court explains why or not. If the district court explains its decision and is correct, then we will, of course, affirm. But if the district court gives reasons and those reasons are "improper," we will affirm so long as there are "grounds upon which the district court could have properly admitted the evidence." *United States v. Johnson*, 54 F.3d 1150, 1156 (4th Cir. 1995). And, similarly, if the district court—like in this case—gives no reasons for admitting the evidence, then we will affirm that unreasoned ruling so long as the record

---

offering it, alongside proof of the statement's falsity, to prove Smith made a defamatory statement. So, for this purpose, the statement would not be hearsay. And so, the complexity should be clear—the same statement, in the same trial, may or may not be hearsay depending on who offered it and why.

[15] If "consistent" is understood narrowly to mean "corroborative"—such that the past statement must be carefully limited to the scope of the present one—then the interview's first stage may fall outside this exclusion. *Cf. United States v. Begay*, 116 F.4th 795, 800 (8th Cir. 2024). On the other hand, if "consistent" reaches more broadly and means something broader like "not inconsistent," then the first stage may fall within the exclusion. Which concept of consistency the federal rules incorporate is unsettled.

13

and the law support the evidence's admission. *See United States v. Hart*, 91 F.4th 732, 743 (4th Cir. 2024); *United States v. Gallo*, 782 F.2d 1191, 1194 (4th Cir. 1986); *see also United States v. Gettel*, 474 F.3d 1081, 1087 (8th Cir. 2007) ("The District Court may be affirmed on any basis for admission, even if not considered at trial.").[16]

Armed with these principles, we have no trouble resolving Ferguson's claim that the challenged evidence was barred by the hearsay rule. Among the evidence problems committed to district courts' discretion is the task of gauging "what the proponent" of the evidence "is trying to prove" with that evidence. *United States v. Gonzales-Flores*, 701 F.3d 112, 117–18 (4th Cir. 2012) (quoting Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 8.12, at 748 n.1 (4th ed. 2009)). So long as the record reveals reasons that would support concluding that the admitted evidence was offered for a nontruth purpose, we may affirm admission on that basis.

The admission of the first stage's three segments passes that test. As we explained above, the statements in the first and third segments concern irrelevant subject matters. The jury could not possibly have benefitted by learning Jane Doe's favorite YouTube

---

[16] In the words of our recently departed colleague, "[t]rials are a rough and ready business." *Bandera v. City of Quincy*, 344 F.3d 47, 54 (1st Cir. 2003) (Boudin, C.J.). The heat of trial seldom affords district courts the opportunity to comprehensively explain their reasons for every evidence admissibility call. *Cf. Salve Regina Coll. v. Russell*, 499 U.S. 225, 231–32 (1991). But that does not diminish the comparative advantage they have in making those calls given their "superior access to the evidence and the well-recognized inability of reviewing courts to reconstruct what happened in the courtroom." *United States v. Arvizu*, 534 U.S. 266, 276 (2002). By virtue of that advantage, and because of the division of labor between trial and appellate courts, any functioning system requires us to respect the "wide discretion in determining the admissibility of evidence" vested in district courts—even when they do not lay out such a decision in step-by-step fashion. *United States v. Abel*, 469 U.S. 45, 54 (1984).

channel or whether she preferred cheerios to cocoa puffs.  So too with how Doe spent the morning before her interview.  But these statements are still relevant—not because of their subject, but because they show that the interview proceeded according to the NCAC protocol.  As the Government explained in argument, "[t]his is precisely how forensic interviews are conducted.  There's a rapport-building relationship to ask these kinds of questions . . . . [S]o we need to assess those statements in the totality of it."  J.A. 262.  So the court below may have easily concluded that the evidence was not hearsay because the government offered these statements for a reason other than the truth of the matter asserted within them.

Though the middle segment where Gottardi and Doe discussed the interview's rules is perhaps a closer call, the district court could have determined that the evidence was not hearsay.  The government did not need to admit the discussion to establish the rules.  The jury already knew what the rules were because Gottardi had explained them on the stand.  And there was no reason to corroborate the rules with an earlier statement because Ferguson never challenged Gottardi's explanation.  So as before, it is hard to see the government offering Gottardi's statements for the truth of the matter asserted within them.

And although one might be tempted to spot hearsay in Doe's responses to Gottardi's rule explanations, it's hard to say what *statements* Doe's "yeses" and "okays" were making, since she was responding to declarative sentences about Gottardi's plans, rather than

15

questions or commands.[17]  But it's easy to see a nontruth purpose for offering Doe's responses:  They show that she participated in the full protocol, which in turn increases the chance that her account later in the interview was reliable.  Given this, the district court would have been well within bounds to find that none of the statements in the first stage of the video were offered for the truth of the matter asserted within them.  And that is reason enough to leave its decision that the evidence was not barred by the hearsay rule undisturbed.

### D.    Rule 403 Unfair Prejudice

Even if the challenged evidence is relevant nonhearsay, the district court could have excluded it under Rule 403.  But it didn't.  The deference we accord to district courts is "particularly" important "with respect to Rule 403 since it requires an 'on-the-spot balancing of probative value and prejudice.'"  *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (quoting 1 Steven A. Childress & Martha S. Davis, *Federal Standards of Review* § 4.02, at 4–16 (3d ed. 1999)).  This judgment call—whether the evidence's probative value is not only "outweighed" by prejudice but "substantially" so— is best left to the district court in all but the most extreme cases.  *See, e.g.*, *Elsheikh*, 103 F.4th at 1026.

We have no doubt that the district court acted within its discretion here.  All the evidence contributed to the prosecution's effort to rehabilitate Jane Doe.  And that issue

---

[17] To take a representative example of Jane Doe's answers, at one point Agent Gottardi said, "I don't want you to make up an answer just because I ask it.  Okay?"  Jane Doe responded by nodding and saying "okay."  Trial Exhibit 3, pt. 1, at 3:20–3:30.

was central to the case. Because the jury had little evidence to go on other than Doe's accusation and Ferguson's denial, any information going to credibility was particularly probative. On the ledger's other side, it is hard to see how this not-very-evocative first stage of the forensic interview could threaten any real prejudice—particularly in comparison to the emotionally charged second stage of the interview that is unchallenged on appeal as consistent with the victim's *viva voce* testimony. And finally, given that the district court excluded some portions of the video on Rule 403 grounds, we do not doubt that it fully considered this issue. So we find no abuse of discretion.

*         *         *

The district admitted evidence that it determined was relevant and not otherwise barred by any rule of evidence. Finding no abuse of discretion in those determinations, the district court must be

*AFFIRMED*.

17